### In re the GLACIER BAY.

### No. A88-115 Civ.

United States District Court,
D. Alaska.

April 13, 1990.

Michael M. Woodell, Bradbury, Bliss & Riordan, Anchorage, Alaska, for Trinidad Corp., West of England Ship Owner's Mut. Ins. Ass'n (Luxembourg), Ltd. (formerly known as The West of England Ship Owners Protection and Indem. Ass'n (Luxembourg), Kee Leasing Co., and Mathiasen's Tanker Industries, Inc.

J.W. Sedwick, Thomas E. Meacham, Burr, Pease & Kurtz, Anchorage, Alaska, (Alan Braverman, Wilmer, Cutler & Pickering, Washington, D.C., of counsel), for Trans–Alaska Pipeline Liability Fund.

John A. Treptow, Atkinson, Conway & Gagnon, Anchorage, Alaska (Lawrence A. Waks, Milgrim Thomajan & Lee, Austin, Tex., of counsel), for Tesoro Petroleum Corp. and Tesoro Alaska Petroleum Co.

Stephen M. Ellis, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, Alaska, for Cook Inlet Response Organization.

James D. Gilmore, Gilmore & Feldman, Anchorage, Alaska, for Andrew Subcleff.

Gary J. Strauss, Garvey, Schubert & Barer, Seattle, Wash. (Marcia Davis, BP Exploration (Alaska), Inc., Anchorage, Alaska, of counsel), for S.P.C. Shipping Inc., Standard Oil Co. and BP America, Inc.

Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, Alaska, for Kenai Pipe Line Co.

R. Michael Underhill, Trial Atty. (attorney to be served) Stuart E. Shiffer, Acting Asst. Atty. Gen., Mark Davis, Acting U.S. Atty., Phillip A. Berns, Atty. in Charge, West Coast Office, Richard A. Knee, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, San Francisco, Cal., for U.S. Coast Guard.

Brian B. O'Neill, Steven C. Schroer, Gerard M. Nolting, Jack M. Fribley, Jeff H. Eckland, Lori Ann Wagner, Sarah Armstrong, Richard A. Duncan, Melanie Julian Muckle, Franklyn F. Bergland, Faegre & Benson, Minneapolis, Minn., Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, Alaska, Martin Friedman, Friedman & Bros., Homer, Alaska, for plaintiffs Bill Choate, et al.

Timothy J. Petumenos, Birch, Horton, Bittner, Cherot & Anderson, Anchorage, Alaska, for plaintiffs Royal Pacific Fisheries, Inc., Inlet Fisheries, Inc., Salamatof Seafoods, Inc.

Peter A. Galbraith, Galbraith & Owen, Anchorage, Alaska, for plaintiff Cook Inlet Processing, Inc.

Robert Hahn, Hahn, Jewell & Stanfill, Anchorage, Alaska, for Eppes, Ducker and Correson, plaintiffs.

C. Michael Hough, Homer, Alaska, for Anahonak, Austin, D. Basargin, Fedosia Basargin, Snegrreff and Wayne Woodhead, plaintiffs.

John C. Pharr, Anchorage, Alaska, for plaintiffs Frank Wood and Stephen R. Dominish.

Kay E. Maassen Gouwens, Asst. Atty. Gen., State of Alaska, Dept. of Law, Anchorage, Alaska, for plaintiff State of Alaska.

## ORDER

HOLLAND, Chief Judge.

### Motions to Dismiss Limitation Complaint

Kee, Mathiasen's, GBTC, and Trinidad jointly filed a complaint for exoneration from or limitation of liability on September 7, 1989. At a pre-trial conference held on November 21, 1989, the court agreed to the parties' request that the lodged monition not be signed until after the motions to dismiss the limitation complaint were decided.

Kee is the owner of the vessel, the *Glacier Bay*. Mathiasen's was a bareboat charterer of the *Glacier Bay*. GBTC was a sub-bareboat charterer of the *Glacier Bay*. GBTC demise-chartered the vessel to Trinidad. Trinidad was the operator of the *Glacier Bay* when the spill occurred. Trinidad had time-chartered the *Glacier Bay* to SPC Shipping. SPC had then entered a long-term contract of affreightment with Tesoro which resulted in a voyage or spot charter of the *Glacier Bay* by Tesoro at the time the oil spill occurred. Tesoro owned the oil which was spilled. Subsequent to the oil spill, Trinidad, GBTC, and Mathiasen's, as affiliated companies of Apex Oil Company, filed a Chapter 11 bankruptcy petition; Kee did not.

Separate motions to dismiss the limitation action were filed by Tesoro, TAPL Fund (Fund), Kenai Pipe Line (KPL), and all plaintiffs in the various damages actions

(plaintiffs). The motions of Tesoro, Fund, and plaintiffs were joined in by SPC Shipping and CIRO, plus third-party defendants: Amoco Production Co., ARCO Alaska, Chevron USA, Kenai Pipeline, Marathon Oil, Phillips Petroleum, Shell Oil, and Union Oil of California. *Amici curiae* briefs supporting the motions to dismiss were lodged (but not accepted by the court) from Senator Ted Stevens, The Wilderness Society, Defenders of Wildlife, and The Sierra Club.

The motions to dismiss are based on two grounds:

(1) That the Trans–Alaska Pipeline Authorization Act, 43 U.S.C. §§ 1651–1655, repealed the application of the Limitation of Vessel Owner's Liability Act, 46 U.S.C. §§ 181–189, to the transportation of oil from the Alaska pipeline; and

(2) That the limitation complaint was untimely filed.

### Effect of TAPAA

Plaintiffs' and the Fund's motions to dismiss raise the issue of whether the Trans–Alaska Pipeline Authorization Act (TAPAA), 43 U.S.C. §§ 1651–1655, repeals the Limitation Act for spills of Alaska pipeline oil.

The Limitation Act permits vessel owners and charterers to limit their liability for damage caused by their vessel to the post-accident value of the ship plus its freight. 46 U.S.C.App. §§ 183, 186. In contrast, TAPAA contains a comprehensive liability scheme for marine spills of Trans–Alaska Pipeline System (TAPS) oil. 43 U.S.C. § 1653(c). TAPAA makes $100 million per spill available to pay damage claims on a strict liability basis. The first $14 million of claims out of that $100 million is paid by the vessel owner/operator. 43 U.S.C. § 1653(c)(3). Any remaining claims, up to an additional $86 million, are paid by the Trans–Alaska Pipeline Liability Fund which is funded by the owners of the TAPS oil. 43 U.S.C. § 1653(c)(3)–(5). The vessel owner/operator and the Fund have certain subrogation rights under TAPAA. In addition, the states are specifically not precluded from imposing additional requirements. 43 U.S.C. § 1653(c)(8)–(9).

The limitation complaint involved here seeks to limit the owner's and charterers' liability to $6,551,282, the post-accident value of the vessel and its freight. Neverthe-

less, there is no dispute among the parties that the Limitation Act does not apply to the vessel owner/operator's strict liability for $14 million under TAPAA. In Trinidad's "Position Paper on Interface of TAPAA and TOVALOP with the Limitation Action", Trinidad, GBTC, Mathiasen's, Kee, and West concede the following points, among others:

3. Trinidad and West *will not* assert in this action that the Limitation Act may be used to limit their potential strict liability under TAPAA for up to $14 million.

. . . .

5. Trinidad, GBTC, Mathiasen's and Kee *will* assert they are entitled to limit their liability pursuant to the Limitation Act as to all causes of action brought by third parties, including the U.S. Government, the State of Alaska and the Trans–Alaska Pipeline Liability Fund for:

a. Amounts in excess of $14 million under TAPAA;

b. All claims brought under the general maritime law;

c. All claims brought pursuant to state statute or state common law.

(Citations omitted; emphasis added.)

Plaintiffs and the Fund separately moved to dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure, on the grounds that the Limitation Act is inapplicable to spills of TAPS oil. Plaintiffs and the Fund asserted that TAPAA established a comprehensive scheme governing liability for maritime spills of TAPS oil that repealed the liability limiting provisions of the Limitation Act. Plaintiffs and the Fund base their position on the "notwithstanding the provisions of any other law" clause in subsection 1653(c)(1), the subsection 1653(c)(9) provision that states may set higher limits on liability than those set out in TAPAA, the subsection 1653(c)(3) provision allowing adjudication of the unpaid portion of any claim under other applicable law, the subsection 1653(c)(8) subrogation rights granted to the Fund, and the legislative history contained in the conference report (H.R. Conf.Rep. No. 924, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin. News 2417, 2523, 2530–2531).

Trinidad, Kee, Mathiasen's, and GBTC (hereinafter collectively referred to as "Trinidad") responded that TAPAA did not repeal the Limitation Act for claims in excess of the $14 million strict liability im-

posed by TAPAA. The United States argues that while the Limitation Act does not apply to either the $14 million of owner/operator's strict liability or the Fund's $86 million strict liability under TAPAA, the Limitation Act does apply to certain claims under TAPAA, such as unpaid portions of claims in excess of $100 million and subrogation rights asserted by the Fund against vessel owners/operators.

The starting point in statutory construction is the language of the statute itself. *Blackfeet Indian Tribe v. Montana Power Co.*, 838 F.2d 1055, 1058 (9th Cir.1988). If the legislative intent was to repeal an earlier statute, that intent must be clear and manifest. *Id.* While TAPAA makes no specific reference to a repeal of the Limitation Act, plaintiffs argue that the clause "notwithstanding the provisions of any other law" (contained in subsection 1653(c)(1)) is clear evidence of legislative intent to supersede the Limitation Act. The United States and Trinidad maintain that the phrase applies only to the strict liability established in subsection 1653(c)(1), and not to the entire subsection. Subsection 1653(c)(1) provides as follows:

> *Notwithstanding the provisions of any other law,* if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans–Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages, including clean-up costs, sustained by any person or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

(Emphasis added.)

Judge Fitzgerald held, in *In re Hokkaido Fisheries Co.*, 506 F.Supp. 631, 634 (D. Alaska 1981), that the language "notwithstanding any other provisions of law" contained in the Clean Water Act, 33 U.S.C. §§ 1251–1376, precluded application of the Limitation Act as to the United States' costs in cleaning up an oil spill. The United States contends that *Hokkaido Fisheries* can be distinguished because the provision for strict liability in the Clean Water Act, which was based on tonnage and exceeded the Limitation Act amount, resulted in a direct conflict with the Limitation Act. The distinction drawn by the United States

is without utility. In this case, the $14 million owner/operator liability exceeds the post-accident value of the *Glacier Bay*. Furthermore, all parties agree that the strict liability provisions of TAPAA repeal the Limitation Act as to the owner/operator's $14 million liability.

The real issue before the court is whether the repeal of the Limitation Act is partial, applying only to the $14 million owner/operator's strict liability, or complete, applying to the entire compensation scheme established in subsection 1653(c).

There is no indication in the language of subsection 1653(c), or elsewhere in TAPAA, that the repeal of the Limitation Act is only a partial repeal. In arguing for a partial repeal, the United States and Trinidad rely on a strained interpretation of the terms "under applicable Federal or state law", which appears in subsection 1653(c)(3) (regarding proceedings to recover unpaid portions of claims), and "under applicable State and Federal laws", which appears in subsection 1653(c)(8) (regarding subrogation rights of the vessel owner/operator and the Fund). Trinidad and the United States contend that those terms include the Limitation Act as "applicable" law.

In contrast, the liability scheme established in subsection 1653(c), read as a whole, supports the conclusion that the repeal of the Limitation Act was complete as applied to TAPS oil. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 689, 102 L.Ed.2d 818 (1989) (which held that the comprehensiveness of the statutory scheme in the Foreign Sovereign Immunities Act was evidence that it repealed the Alien Tort Statute). Subsection 1653(c)(1), which contains the "notwithstanding ... any other law" provision, generally creates strict liability for spills of TAPS oil. The remaining eleven subsections, which include the Fund's subrogation rights and state law extension of liability authorization, deal with specifics which relate back to the general grant of strict liability contained in subsection 1653(c)(1).

Subsection 1653(c)(3), which sets the limits of strict liability at $100 million with vessel owners/operators strictly liable for the first $14 million and the Fund strictly liable for the balance, concludes with the following provision:

> If the total claims allowed exceed $100,000,000, they shall be reduced proportionately. The unpaid portion of any

claim may be asserted and adjudicated under other applicable Federal or state law.

The only reasonable interpretation of that provision is that the Limitation Act is repealed and does not foreclose suits under other law.

Subsection 1653(c)(8) provides further support for the conclusion that the Limitation Act is completely repealed. It reads as follows (emphasis added):

> *In any case where liability without regard to fault is imposed pursuant to this subsection* and the damages involved were caused by the unseaworthiness of the vessel or by negligence, the owner and operator of the vessel, and the Fund, as the case may be shall be subrogated under applicable State and Federal laws to the rights under said laws of any person entitled to recovery hereunder. If any subrogee brings an action based on unseaworthiness of the vessel or negligence of its owner or operator, it may recover from any affiliate of the owner or operator, if the respective owner or operator fails to satisfy any claim by the subrogee allowed under this paragraph.

(Emphasis added.) These subrogation rights clearly relate back to the strict liability imposed in subsection 1653(c)(1).

In addition, subsection 1653(c)(8) provides that if the Fund brings an action based on the negligence of the owner/operator and the claim is not satisfied, the Fund can recover from any affiliate of the owner/operator. "Affiliate" is a term defined in subsection 1653(c)(11) to include any person who effectively controls the vessel owner or operator. This provision is inconsistent with the purpose of the Limitation Act, which was to promote a healthy merchant marine by encouraging investments in ships and their use in commerce through the device of limited liability. *See Esta Later Charters, Inc. v. Ignacio*, 875 F.2d 234, 238 (9th Cir.1989).

Finally, subsection 1653(c)(9) provides:

> This subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements.

This provision would be rendered meaningless if the Limitation Act applied. Actions under other applicable law would be futile if there were no possibility of recovery.[1]

Because the language of the statute supports an intent to repeal other laws limiting recovery for a TAPS oil spill, resort to the legislative history is not necessary. Nevertheless, the gist of the conference report as to subsection 1653(c) is that Congress was concerned with the source of funding for oil spill damage claim compensation, rather than with limiting the liability of vessel owners and operators.

> The Conferees concluded that existing maritime law would not provide adequate compensation to all victims, including residents of Canada, in the event of the kind of catastrophe which might occur. Consequently, the Conferees established a rule of strict liability for damages from discharges of the oil transported through the trans-Alaska Pipeline up to $100,000,000.
>
> Strict liability is primarily a question of insurance. The fundamental reason for the limits placed on liability in the Federal Water Quality Improvement Act stemmed from the availability, or nonavailability, of marine insurance. Without a readily available commercial source of insurance, liability without a dollar limitation would be meaningless and many independent owners could not operate their vessels. Since the world-wide maritime insurance industry claimed $14 million was the limit of the risk they would assume, this was the limit provided for in the Federal Water Quality Improvement Act. There has been no indication that this level has since increased.
>
> Accordingly, the Conferees adopted a liability plan which would make the owner or operator strictly liable for all claims (for both clean-up costs and damages to public and private parties) up to $14 million. This limit would provide an incentive to the owner or operator to operate the vessel with due care and would not create too heavy an insurance burden for independent vessel owners lacking the means to self-insure.

H.R.Conf.Rep. No. 924, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 2523, 2530–2531.

Congress established a strict liability source of at least $100 million through the oil owners' payments to the Fund and the requirement that owner/operators have evidence of financial responsibility for the $14 million before oil could be loaded. Con-

---

**1.** The court specifically notes that it does not have before it the question of the validity of any law adopted by the state pursuant to this provision.

gress left claimants to bear the risk that judgments on claims exceeding the $100 million might be uncollectable. Congress intended that the potential for such relief be available and that the Fund and others have open to them the usual full range of remedies, such as subrogation rights, without limitation from application of 46 U.S.C. App. §§ 181–189.

### Timeliness

It is not necessary to reach the second grounds for dismissal inasmuch as the first grounds is dispositive of the motions.

Accordingly, all four motions to dismiss are granted and the limitation complaint is dismissed in its entirety.