Chet HOLIFIELD, an Individual, Don Slaven, an Individual, Yeriko Nitta, d/b/a the Seacliff Motel on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

BP AMERICA, INC.; BP Oil Shipping Co., USA; American Trading Transportation, Co. Inc.; American Trading and Production Corp.; and the Trans-Alaska Pipeline Liability Fund; Golden West Refining Company and Brandenburger Marine, Inc., Defendants.

Branko SINDICICH, Vicko T. Fiamengo, Sal Manzeralla, Donald Kusar, Sam Karr, Carlo Benares, Vito Battaglia, Steve Mardesich, Steven Mardesich, Angelo LoGrande, Terry Wilmarth, Dominic J. Balestreri, Salvatore Russo, Peter LoGrande, Crescenzo Iacono, Sam Randazzo, and John Dorio, Plaintiffs,

v.

BRITISH PETROLEUM PLC, a foreign corporation, B.P. North America Inc., a Delaware Corporation, B.P. North America Petroleum, Inc., a Delaware Corporation, and American Trading and Transportation Co., a Maryland Corporation, Defendants.

In the Matter of the Complaint of AMERICAN TRADING TRANSPORTATION CO., INC., Owner of the Steam Tanker, AMERICAN TRADER, for Exoneration from or Limitation of Liability.

SPORTFISHING ASSOCIATION OF CALIFORNIA, INC., et al., Plaintiffs,

v.

BP AMERICA, INC.; BP Oil Shipping Co., USA; American Trading Transportation, Co., Inc.; American Trading and Production Corp., and the Trans-Alaska Pipeline Liability Fund; Golden West Refining Company and Brandenburger Marine, Inc., Defendants.

STATE FISH COMPANY, INC., the St. Joseph Association, Inc., John Aiello; Bill Hargrave, Santa Maria Fishing, Inc., Vito A. Gioiello, Anna Maria, Inc., Attillo Gioiello, Bernard J. Mattera, Qualy Pak Foods, Inc., Sea Scout, Inc., and Ferrigino Enterprises, Inc., Plaintiffs,

v.

BP AMERICA, INC., BP Oil Shipping Co., USA, American Trading Transportation, Co., Inc., American Trading and Production Corp., and the Trans-Alaska Pipeline Liability Fund; Golden West Refining Company and Brandenburger Marine, Inc., Defendants.

STEVE P. RADOS, INC., a California Corporation, Plaintiff,

v.

BP OIL SHIPPING COMPANY, USA, a corporation, and BP Oil Supply Company, a Corporation, Defendants.

Nos. CV-90-722-RJK, CV-90-733-RJK, CV-90-2619-RJK, CV-90-1151-RJK, CV-91-334-RJK and CV-91-515-RJK.

United States District Court, C.D. California.

June 19, 1991.

Robert E. Coppola, William P. Barry, Kenneth E. Johnson, Baker & Hostetler, McCutchen Black, Long Beach, Cal., for BP Oil Shipping Co. USA, BP Oil Supply Co. and BP America, Inc.

John S. Gray, Law Offices of John S. Gray, Fountain Valley, Cal., for Newport Sailing Club, Inc.

Daniel E. Lungren, Atty. Gen., Roderick E. Walston, Chief Asst., Sylvia Cano Hale, Deputy, Office of Atty. Gen., Los Angeles, Cal., Dennis M. Eagan, Linus Masouredis, Deputies, Oakland, Cal., for State of Cal.

Gail Hutton, City Atty., Huntington Beach, Cal., Law Offices of James H. Ackerman, Long Beach, Cal., for City of Huntington Beach.

Philip D. Kohn, City Atty., Rutan & Tucker, Costa Mesa, Cal., for City of Laguna Beach.

Joseph M. Murphy, Newport Beach, Cal., for Jack Morici.

Thomas M. Crehan, San Pedro, Cal., for G. Nazzareno, Inc., Sea Queen, Inc., Bimbo, Inc., United Food Processors, Ltd., The Fishermen's Ass'n of San Pedro, Trama Fishing Co., Inc., Maria Fishing, Inc., St. George II, Inc., Maria T., Inc., N.N.P.F. Enterprises, Inc., Fiore Enterprises, Inc., Nonna Maria Fishing, Inc. and Ingrande Palma, Inc.

Gregory W. Stepanicich, City Atty., City of Seal Beach, Quinn M. Barrow, Michael G. Colantuono, Richards, Watson & Gershon, Los Angeles, Cal., for City of Seal Beach.

Michael F. Minchella, Monteleone & McCrory, Universal City, Cal., Dennis J. Kelly, Anita Benjamin, Kelly, Cox, Wootton, Welch, Gill & Sherburne, San Francisco, Cal., for Steve P. Rados, Inc.

Francis J. MacLaughlin, White & Case, Los Angeles, Cal., James Robertson, A. Stephen Hut, Jr., Alan N. Braverman, Wilmer, Cutler & Pickering, Washington, D.C.,

for the Trans-Alaska Pipeline Liability Fund.

Jack Corinblit, Marc M. Seltzer, Gretchen Nelson, Corinblit & Seltzer, Los Angeles, Cal., Merrill G. Davidoff, Harold Berger, Daniel Berger, Peter Nordberg, Berger & Montague P.C., Philadelphia, Pa., Christina A. Snyder, Katten Muchin Zavis & Weitzman, Los Angeles, Cal., Stephen D. Oestreich, Ellen P. Chapnick, Wolf, Popper, Ross, Wolf & Jones, New York City, for Chet Holifield and Don Slaven as class representatives.

Adrian Kuyper, County Counsel, Carol D. Brown, Deputy, County of Orange, Michael R. Capizzi, Dist. Atty., Jan J. Nolan, Deputy, County of Orange, Santa Ana, Cal., for County of Orange.

Robert H. Burnham, City Atty., Robin Flory, Asst., City of Newport Beach, Newport Beach, Cal., for City of Newport Beach.

Joseph N. Mirkovich, Carlton E. Russell, Russell & Mirkovich, Long Beach, Cal., for Brandenburger Marine, Inc.

George J. Tomlinson, Santa Barbara, Cal., for Peter Guglielmo and Aneillo Guglielmo.

Erich P. Wise, Nicholas S. Politis, Michael J. Swain, Angelo F. Piersanti, Graham & James, Long Beach, Cal., for Golden West Refining Co.

Stewart M. Gerson, Ricard B. Stewart, Asst. Attys. Gen., Robert L. Brosio, U.S. Atty., Roger E. West, First Asst. Chief, Los Angeles, Cal., Philip A. Berns, Atty. in Charge, Bob Cunningham, Karen Dworkin, U.S. Dept. of Justice, San Francisco, Cal., for U.S.

Howard D. Sacks, San Pedro, Cal., for Salvatore Russo, Steven A. Panto, Donna L. Panto, Steven J. Panto, Danielle D. Panto, Salvatore Manzella, Tommy Manzella, Sam Carr, Steve Mardesich, Angelo LoGrande, Jo LoGrande, Peter Paul LoGrande, Benedetto LoGrande, Vicko T. Fiamengo, Frank Fricia, Mildred Fricia, Gregory Kuglis, Andrew Kuglis, Steven Burklund, Frank Iacono, Joe Cracchiolo, Vincent Ferrera, Carl Gassaway, John M. Doherty, Guiseppe Russo, Vince Lauro, Joe Caruso, Frank Trama, Jack MacDowd, Jim Grammatico, Vito Rinaudo, Branko Sindicich, Vito Battaglia, Don A. Kusar, Dominic Balestrieri, Crescenzo Iacono, Sam Randazzo, John Dorio and Robert Barker II.

Patrick Marley, Cole & Marley, Los Angeles, Cal., for Sport Fishing Ass'n of California and United Anglers of California.

Fred J. DiBernardo, San Pedro, Cal., George V. Allen, Jr., Jeffrey L. Yablon, Maryelena Pardo, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for State Fish Co., Inc., The St. Joseph Ass'n, Inc., John Aiello, Bill Hargrave, Santa Maria Fishing, Inc., Vito A. Gioiello, Anna Maria, Inc., Attillo Gioiello, Bernard J. Mattera, Qualy Pak Foods, Inc., Sea Lanes II, Inc., Sea Scout, Inc. and Ferrigino Enterprises, Inc.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

This motion arises out of the oil spill at Golden West's offshore mooring facility in Huntington Beach on February 7, 1990. On February 6, 1990, the tanker vessel Keystone Canyon was anchored outside the California coast. The Keystone Canyon was carrying Trans–Alaskan Pipeline System ("TAPS") crude oil loaded onto it at Valdez. The Keystone Canyon lightered the TAPS oil to the American Trader which, in turn, set course for the Golden West Terminal Mooring Facility off of Huntington Beach. The American Trader planned to unload a portion of the oil at the Huntington Beach facility and then transport the rest to Long Beach.

While the American Trader was attempting to berth at the Huntington Beach facility, its hull was ruptured, resulting in about 400,000 gallons of TAPS oil spilling into the coast off of Huntington Beach.

Defendant Trans–Alaska Pipeline Liability Fund ("the Fund") has moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss for failure by Plaintiffs to state a claim. The Fund claims that Plaintiffs' claims do not come within the Trans–Alaska Pipeline Authorization Act ("TAPAA") which is the sole

basis of liability that could be asserted against the Fund.

Furthermore, the Fund asserts that, even if Plaintiffs' claim falls within TAPAA, Plaintiffs have failed to exhaust their administrative remedies. Thus, the Fund asserts that Plaintiffs' motion is not properly before this Court.

Finally, the Fund moves to dismiss, in CV–90–2619–RJK, plaintiff ATTRANSCO's complaint for exoneration from or limitation of liability.

The Court heard oral argument on the matter on February 25, 1991. The Court now (1) denies the Fund's motion that TAPAA does not apply to it; (2) denies the Fund's motion that the claimants need to exhaust their administrative remedies before bringing an action in the District Court; (3) continues to keep the issue of whether TAPAA repeals the Limitation Act under submission until the Ninth Circuit decides this issue; and (4) treats this motion to dismiss as one for summary judgment.

## I

### A. *The Fund*

The Fund is a non-profit entity which may sue and be sued in its own name. It is administered by the holders of the pipeline right-of-way under the regulations promulgated by the Secretary of the Interior. The Fund is funded by the owners of the TAPS oil. The operator of the pipeline shall collect from the owner of the oil at the time it is loaded on the vessel a fee of five cents per barrel. 43 U.S.C. § 1653(c)(5). The collection shall cease when $100,000,000.00 has been accumulated in the Fund, and it shall be resumed when the accumulation of the Fund falls below $100 million dollars. *Id.*

The Fund is governed by a ten person board of trustees. 43 C.F.R. § 29(b)(1). The Fund trustees owe a duty to those injured by spills covered by TAPAA to evaluate their claims carefully and to offer to pay expediently all allowable claims for damage that result from covered spills.

Strict liability for all claims arising out of any one incident shall not exceed more than $100 million dollars. 43 U.S.C. § 1653(c)(3). A vessel owner or operator is strictly liable for damages which result from a discharge of TAPS oil for an amount up to, but no greater than, $14 million dollars. *Id.* The Fund is liable for the balance of the claims to $100 million. *Id.*

### B. *Whether the Plaintiff's Claims Come Within TAPAA*

■ This is an issue of statutory interpretation. The governing statutes and regulations, however, are inherently inconsistent. The Court will lay out the statutes and illustrate the inconsistencies.

43 U.S.C. § 1653(c)(1) provides:

Notwithstanding the provisions of any other law, if all oil which has been transported through the Trans–Alaskan pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and the operator of the vessel (jointly and severally) and the Trans–Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for all damages . . . as the result of discharge of oil from such vessel.

Since the American Trader had not loaded the cargo at the terminal facilities of the pipeline at Valdez, this subsection does not apply to it. Thus, the American Trader and the Fund would not be jointly and severally liable pursuant to this subsection.

However, 43 U.S.C. § 1653(c)(7) provides:

The provisions of this subsection shall apply only to vessels engaged in the transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States. Strict liability under this subsection shall cease when the oil has first been brought ashore at a port under the jurisdiction of the United States.

This subsection seems to apply to the American Trader. The American Trader spilled the oil while transporting it from Valdez to Huntington Beach.

Pursuant to TAPAA, the Department of the Interior promulgated regulations which provided for the organization, governance, and operation of the Fund and which elaborated on the scope and intended operation of TAPAA. However, these regulations are also inherently inconsistent.

43 C.F.R. 29.1(h) defines incident or spill as "a discharge of oil from a vessel which is carrying TAPS oil loaded on that vessel at the terminal facilities of the pipeline." This does not cover the American Trader since the TAPS oil was not loaded on it at the terminal facilities of the pipeline.

However, § 29.7(a) states:

Notwithstanding the provisions of any other law where a vessel is engaged in any segment of the transportation between the terminal facilities of the Pipeline and ports under the jurisdiction of the United States, and is carrying TAPS oil, the Owner and Operator (jointly and severally), and the Fund established by [TAPAA], shall be strictly liable without regard to fault in accordance with that section for all damages ... as a result of any discharge of TAPS oil from such vessel. Strict liability under this subsection shall cease when the TAPS oil has first been brought ashore at a port under the jurisdiction of the United States.

This section seems to include the American Trader and the Fund. The American Trader was a vessel engaged in "any segment" of the transportation of the TAPS oil which had not brought the oil ashore in the United States. Thus, the American Trader and the Fund seem strictly liable, jointly and severally, under this subsection.

Since no case law exists which addresses these inconsistencies, the Court must interpret the statutes and the regulations to see which subsections control.

## C. *Statutory Interpretation*

"A court's objective when interpreting a federal statute is to ascertain the intent of Congress and give effect to legislative will." *Turner v. McMahon*, 830 F.2d 1003, 1007 (9th Cir.1987). The Court is to begin with the statute's language, and, absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive. *Id.*

1. The Fund's Argument that the Language of the Statute Clearly States that Subsections (c)(1) and (c)(7) are Consistent

The Fund argues that the language is clear. The Fund argues that § 1653(c)(1) clearly applies only to vessels onto which TAPS oil was unloaded. Since the American Trader got the oil from the Keystone Canyon and not from Valdez, the Fund asserts that it is not liable under the subsection.

The Fund argues that § 1653(c)(1) is consistent with § 1653(c)(7). The Fund states that this subsection only applies to the vessels which actually pick up the oil from Valdez and then transport it to a port of the United States. The Fund asserts that this subsection does not cover vessels which, as in this case, have passed the oil it picked up from Valdez to another vessel which, in turn, spilled it.

Furthermore, The Fund contends that § 1653(c)(7) also states that liability does not attach indefinitely to a vessel which departed Valdez. It rejects the contention of some of the other parties who have opposed this motion that this subsection states that liability "continues until" the oil is brought ashore. Rather, the Fund proposes that the statute limits the liability of the Fund and the vessel. It states that the subsection provides that liability "ceases when" the oil is brought ashore, not "continues until" the oil is brought ashore. The Fund seems to be contending that its liability ended when the Keystone Canyon transferred the oil to the American Trader. Thus, it seems to state that this transfer constituted bringing the oil ashore, terminating its liability.

Therefore, the Fund asserts that the language clearly illustrates that Congress' intent was that only vessels which carried the oil from Valdez to a port under the jurisdiction of the United States is covered by TAPAA. The Fund asserts that the American Trader is not covered by TAPAA

since it received the oil from the Keystone Canyon.

### 2. The Opposition's Arguments that the Language of the Statute Clearly States that the Subsections are Consistent

Some of the opposing parties have argued that the language of the statute illustrates Congress' intent that any vessel involved in the transportation of TAPS oil is strictly liable, along with the Fund, for oil spills. They argue that subsection (c)(7), read in conjunction with subsection (c)(1), states that vessels carrying TAPS oil are subject to TAPAA liability if and only if they are "engaged in transportation between the terminal facilities of the pipeline and ports under the jurisdiction of the United States." The liability of the vessels thus engaged in the transportation of TAPS oil, they argue, terminates when and only when "the oil has first been brought ashore at a port under the jurisdiction of the United States."

Furthermore, these parties point to 43 C.F.R. 29.7(a) which states that "a vessel engaged in any segment of transportation between the Terminal Facilities of the Pipeline and ports under the jurisdiction of the United States," to support their proposition. They claim that this subsection of the regulation clearly illustrates that Congress intended vessels which loaded the oil from another vessel and subsequently spilled the oil to be liable.

### 3. Analysis

It is not clear from the language itself whether § 1653(c)(7) and § 1653(c)(1) are consistent. As stated earlier, § 1653(c)(7) applies to vessels engaged in the transportation of the oil from Valdez to a port in the United States. On its face, the subsection could include the American Trader since it was a vessel engaged in such transportation. The subsection, unlike subsection (c)(1), does not state that the vessel must have actually loaded oil onto the vessel at Valdez.

Thus, it is too difficult to state conclusively what Congress' intent was from the language of the statute itself. Strong arguments have been made supporting both interpretations presented. Thus, the Court must look to the legislative history of the statute to determine what Congress intended.

### 4. Legislative History
#### a. *The Fund's Arguments*

The Fund first points to the statements made in the House Report which accompanied the passage of what became the Oil Pollution Act of 1990. This Report included a comment in an amendment to the Act which proposed to

> close a loophole in the Trans–Alaskan Act to ensure that spills of Alaskan crude, whether from the vessel which originally loaded the crude in the Valdez, or a subsequent vessel that carried the oil to a U.S. port, are covered by the provisions of the Act.

H.R.Rep. No. 242, 101st Cong., 1st Sess., pt. 2, at 8 (1989). Furthermore, the amendment's sponsor, Congressman Tauzin, also stated that such a loophole existed in that "tankers are only covered during their journey from Valdez to a port under U.S. jurisdiction." *Id.*

The Fund also points to the Conference Report's explanation of § 1653(c) for support. The Fund asserts that Congress was concerned with spills from the large tankers which could load at Valdez. *See* H.R.Rep. No. 624, 93rd Cong., 1st Sess. at 28 (1973).[1] The Fund also asserts that Congress enacted TAPAA to facilitate prompt payment of damages on a strict liability basis for spills from vessels of large sizes. *Id.*

Thus, the Fund argues that the legislative history of TAPAA supports its conten-

---

1. The specific language states:
 It is expected that tankers as large as 250,000 deadweight tons will transport North Slope crude to ports on the west coast of the United States and elsewhere. Oil discharges from vessels of this size could result in extremely high damages to property and natural resources including fisheries and amenities, especially if the mishap occurred close to a populated shoreline area.

tion that the American Trader and the Fund are not liable under the statute.

### b. *The Opposition's Argument*

The opponents argue that, when a statute's language is ambiguous, the interpretation of the statute by the agency charged with its administration is granted substantial deference. *Haynes v. United States*, 891 F.2d 235, 238 (9th Cir.1989); *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Department of the Interior, the Federal Maritime Commission, and the Coast Guard are three of the agencies responsible for the enforcement of TAPAA, and all have interpreted the statute.

The Department of the Interior stated: Since the Department of the Interior is charged with the implementation of the Trans–Alaska Pipeline Liability Fund and therefore with the interpretation of [§ 1653] of the Act, it has a duty to clarify this apparent inconsistency. For two reasons, the Department interprets [this section] to impose strict liability on vessels engaged in any segment of transportation between the terminal facilities of pipeline and ports under the jurisdiction of the United States, which vessels are carrying oil that has been transported through the Trans–Alaskan pipeline system ... The clear intention of Congress in passing [this section] and in creating the Fund was to provide compensation to parties damaged by spills of Alaskan oil regardless of whether the oil is transloaded before a United States port.

42 F.R. No. 121, p. 31789.

The Federal Maritime Commission Regulations interpreted the statute as follows: When the broad purposes of the Act are considered, to wit: to push ahead with the construction and operation of the Trans–Alaska pipeline without permitting further environment challenge, and to provide compensation for injuries sustained as a result of the production and transportation of Alaskan oil; and in view of the position taken by the Department of the Interior in its final rules regarding this subject, the Commission concludes that the sounder interpretation of the Act is that its financial responsibility provisions apply to all vessels engaged in any segment of the transportation of Trans–Alaskan pipeline oil between the terminal facilities of the pipeline and the port under the jurisdiction of the United States where that oil is first brought ashore.

Accordingly, the Commission intends these regulations to apply to any vessel which has on board oil which has been transported through the Trans-Alaska pipeline at the time it is first brought ashore at a port under the jurisdiction of the United States, regardless of the purpose for which oil is aboard the vessel. These rules shall apply to vessels which originally load the oil in Alaska, as well as to those vessels which receive such oil from any source and for any purpose, until such time as it is first brought ashore at a port under the jurisdiction of the United States. By the words "brought ashore" the Commission means the point where the oil is physically located on or above dry land, inland of the mean high tide mark, and at rest in such manner as to preclude the movement of the oil seaward again without the intervention of an intentional act by some person.

42 F.R. No. 146, pp. 38798–38821.

Finally, the Coast Guard regulations implementing TAPAA's financial responsibility requirements likewise extend to "all operators of vessels" engaged in "any segment of the transportation of [TAPS] oil between the terminal facilities of the Trans–Alaska pipeline and the port under the jurisdiction of the United States where that oil is first brought ashore." 33 C.F.R. § 131.1(a). Moreover, the regulations require vessels loading TAPS oil "from any source, including, but not limited to, another vessel" to possess the certificate of financial responsibility that TAPAA requires. 33 C.F.R. § 131.4(c).

### c. *Analysis*

Thus, the agencies which administer TAPAA state that vessels engaged in any segment of the transportation of TAPS oil

would be strictly liable, jointly and severally with the Fund, for any spill which occurs before the oil is brought ashore in a United States port. Furthermore, the Federal Maritime Commission Regulations has defined "brought ashore" as meaning the oil's final destination; thus, a transfer of oil between the ships does not constitute "brought ashore."

Moreover, the legislative history that the Fund cites is that of a subsequent Congress while discussing the Oil Pollution Act of 1990, not TAPAA. These are the only Congressional statements available regarding TAPAA, and subsequent legislative history may have persuasive value. *Bell v. New Jersey*, 461 U.S. 773, 784–785, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 312 (1983). However, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm. v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980). "And ordinarily even contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history." *Id.* Thus, the interpretation of the regulating agencies seems to be more reliable and significant than that of a subsequent Congress discussing another Act.

Therefore, the Court finds that the Fund and the American Trader are strictly liable under TAPAA. *The Court, thus, denies the Fund's motion to dismiss on this ground.*

## II

A. *Whether the Plaintiffs Must Exhaust Their Administrative Remedies Before Bringing Suit in the District Court*

a. The Fund's Arguments

The Fund argues that TAPAA and 43 C.F.R. § 29 et seq. states that all claims must first go to the Fund for determination and only to the District Court when the claimants are not satisfied with the Fund's determination.

The Fund first cites policy reasons for this belief. First, the Fund states that this will serve the best interests of the plaintiffs in providing a prompt resolution of their claims. *See Wong v. Department of State*, 789 F.2d 1380, 1384 (9th Cir.1986). Second, the Fund argues that avoidance of litigation, in preference to administrative problem solving, better conserves the resources of the Court, the parties, and society. *See Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 109 S.Ct. 1361, 1374, 103 L.Ed.2d 602 (1989). Third, exhaustion better allows application to acquire expertise. *Id.*

The Fund then turns to 43 C.F.R. § 29 to further support its proposition. § 29.-9(d)(2) provides:

> The Fund shall establish uniform procedures and standards for the appraisal and settlement of claims against the Fund, including but not limited to procedures for appraising claims made to the vessel Owner or Operator to determine when the $14 million level which it receives meets the definition of damages; and procedures for determining when the services of a private insurance and claims adjuster shall be used.

Furthermore, § 29.9(i) provides that "any claimant aggrieved by the Fund's decision on a claim may appeal the decision in the appropriate Federal district court." The Fund states that this subsection explicitly demonstrates that the claimants must bring their claims to it before they can bring suit in this Court.

The Fund also cites 52 Fed.Reg. 22,539 June 13, 1987 for support. The Department of the Interior stated that "in the event of an oil spill of sufficient severity to reach the threshold liability of the Trans–Alaska Pipeline Liability Fund, damaged parties must file claims with the Fund in order to recover." *Id.*

Finally, the Fund points to the tentative ruling of Judge Holland of the District Court of Alaska who stated, in the *Exxon Valdez* case, that the claimants should first exhaust the Fund's administrative payment procedures before bringing their cases to District Court. Judge Holland's tentative ruling stated that allowing parties to proceed in state or federal court without first

exhausting the Fund's administrative payment procedures would thwart the congressional purpose of expediently providing adequate compensation to all those injured by TAPS oil. Judge Holland believed that Congress provided a mechanism in TAPAA for recovering damages that does not require any litigation. Furthermore, he tentatively concluded that the only litigation that the District Court should entertain as to monetary losses is either appeals from the Fund's decisions on payment of individual TAPAA claims or suits based on other applicable law for recovery of any unpaid portion of TAPAA claims.[2]

### b. The Opposition's Arguments

The parties who oppose the motion make a number of different arguments stating that TAPAA does not provide for exhaustive remedies. Since there are a number of different parties opposing the motion, the Court will treat their oppositions inclusively and refer to the parties as "the opponents."

First, the opponents claim that the doctrine of exhaustion of administrative remedies applies only to agencies of the United States Government. *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Non-profit, private corporations, like the Fund, do not qualify as agencies of the Federal Government. *Public Citizen Health v. HEW*, 668 F.2d 537, 543–544 (D.C.Cir.1981); *Shultz v. SEC*, 614 F.2d 561, 569 (7th Cir.1980). Thus, they argue the doctrine of exhaustion of remedies does not apply to the Fund.

Second, the parties argue that when Congress intends to require exhaustion of administrative remedies before allowing the claimant access to the judiciary, it does so explicitly. They cite the Toxic Substance Control Act, 15 U.S.C. §§ 2619, 2620, the Contract Disputes Act, 41 U.S.C. § 609(a)(1), (3) and the Federal Torts Claims Act, 28 U.S.C. § 2675(a) as examples of Congress explicitly allowing for administrative remedies. Since neither the statute nor the Department of the Interior's regulations explicitly require that the

claimants bring their claims to the Fund first and then to the District Court only for appeal, the opponents assert that Congress did not intend claimants to exhaust their remedies before bringing suit in the District Court.

The opponents then argue that where no explicit statutory requirement of exhaustion of administrative remedies exists, the application of exhaustion rules is a matter committed to the discretion of the District Court. *Morrison–Knudsen Co., Inc. v. CHG Intern Inc.*, 811 F.2d 1209, 1223 (9th Cir.1987). "In exercising its discretion to decline jurisdiction, or to stay proceedings, the district court must balance the agency's interest in applying its expertise, correcting its own errors, making a proper record, and maintaining an efficient, independent, administrative system, against the interests of private parties in finding adequate redress." *Id.* Among the factors to be considered are whether to resort to the administrative process would be futile, whether the administrative process is well understood and well developed, whether a prompt decision as to all of the contested issues in the case is likely, whether an exhaustion requirement would be fair to the parties in light of their resources, whether it would be fair to other parties in the case whose interests might be affected, whether the interests of judicial economy would be served by requiring exhaustion, and whether the agency demonstrates that not requiring exhaustion would unduly interfere with its function. *Id.* at 1223–1224. The opponents argue that the balance must tip in their favor since the Fund does not provide an adequate administrative process.

The opponents then turn to 43 C.F.R. § 29.9(g) for further support. This subsection provides that "[n]o claim may be presented, nor any action commenced, for damages ... unless that claim is presented to or that action is commenced ... within two years." The opponents claim that this subsection illustrates that the claimants have two avenues of recourse: the Fund or the District Court. A two-year statute of

---

**2.** Judge Holland's support for his tentative ruling is 43 C.F.R. § 29.9(a).

limitations applies to either mode of recourse the claimants decide to take.

### c. Analysis

The Court will address each of the arguments in the order presented above for clarity's sake.

 The Fund argued that the claims should first be exhausted for the policy reasons of judicial economy and for allowing the Fund to apply its expertise. However, policy considerations alone cannot justify judicially imposed exhaustion unless this exhaustion is consistent with Congressional intent. *Patsy v. Board of Regents of the State of Fla.*, 457 U.S. 496, 513, 102 S.Ct. 2557, 2566, 73 L.Ed.2d 172 (1982). Thus, these considerations alone are not enough to justify exhaustion unless Congress intended the claimants to exhaust their claims with the Fund before filing suit in this Court.

However, nothing in TAPAA seems to require, either explicitly or implicitly, that the claimants exhaust their remedies with the Fund. Furthermore, the Fund points to no legislative history which shows Congress' intent. Therefore, this argument has no merit.

The Fund asserts that 43 C.F.R. §§ 29.9(d)(2) and (i) and 52 Fed.Reg. 22,539, June 13, 1987 illustrate the exhaustion requirement. 52 Fed.Reg. 22,539, June 13, 1987 states that damaged parties must file claims with the Fund in order to recover.

However, §§ 29.9(d)(2) and (i), while providing that the Fund shall be able to hear claims made by those injured by TAPS oil, do not provide that the Fund has exclusive jurisdiction to hear these claims. Rather, the subsections, read together, seem to give claimants the opportunity to have the Fund hear their claims if they decide that they would rather not litigate their claims. If the claimants choose to have the Fund hear their claims, and are not satisfied with the Fund's determinations, they can then appeal to the District Court.

Moreover, 52 Fed.Reg. 22,539 does not seem to state that the claimants must have the Fund hear their claims. Rather, the regulation seems to assert that a claimant must file a claim with the Fund before he or she proceeds by either having the Fund or the District Court hear the claim. This could merely be a notice requirement to inform the Fund whether it may have any liability. The Owners and Operators are liable for the first $14 million in damages, and the Fund is liable for the subsequent $86 million. Thus, requiring the claimants to file their claims with the Fund would give the Fund the opportunity to determine how much, if any amount, it may have to pay. Furthermore, making the claimants file with the Fund may allow the Fund to determine if the injury is the type for which the Fund is strictly liable. In any case, the regulation does not explicitly state that the Fund has exclusive jurisdiction over the claims. This, read in conjunction with 43 C.F.R. §§ 29.9(d)(2) and (i), seem to indicate that the injured parties file their claims with the Fund. They then can decide if they want the District Court or the Fund to hear their claims.

This interpretation seems the more plausible one when read in light of 43 C.F.R. § 29.9(g) which the opponents have cited in their oppositions. This section, as stated previously, asserts that the claimants have two years from the time of the date discovery of the damages or of the incident causing them in which to file a claim with the Fund or to commence *any action* to recover damages. This seems to illustrate that the claimants have the choice of having either the Fund or the Court determine their damages.

This interpretation seems to make sense when one considers that the Fund could conceivably take more than two years to decide the amount of damages to be paid. In this case, this subsection would seem to preclude the claimants from appealing the Fund's determination to the District Court under § 29.9(i) because the two-year statute of limitations would have run.[3] More-

---

**3.** The Court predicates this analysis on the Fund's argument that a distinction exists between a claim presented to the Fund and "any action" commenced. A claimant may, accord-

over, the language in this subsection is revealing. The subsection considers language in this subsection is revealing. The subsection considers claims "presented" as opposed to claims filed. This would seem to indicate that the subsection is addressing claims "presented" to the Fund as opposed to the mere filing of claims with the Fund. Thus, 43 C.F.R. § 29.9(g) seems to give the claimants two avenues to address their claims: the Fund and the District Court.

The Fund disputes this interpretation of § 29.9(g) by claiming that it addresses only the Owners and Operators and not the Fund. The Fund claims that the only judicial action in question is against a recalcitrant owner for unpaid claims up to $14 million, not an original action against the Fund for the remaining $86 million. However, this argument is erroneous. The subsection covers an action or claim "commenced against the vessel Owner or Operator, or their guarantor, *or against the Fund, as to their respective liabilities.*" 43 C.F.R. § 29.9(g) (italics added). Thus, the action considered by the subsection seems to be an original court action to determine the damages that the Fund must pay. Therefore, the Fund's interpretation seems to have no merit.

Next, the Fund cited Judge Holland's tentative ruling. However, two points should be made about this. First, Judge Holland apparently made this tentative ruling without any briefing on the issues by the parties. Second, Judge Holland deferred ruling on the issue even after the parties had briefed it. Although Judge Holland was still leaning toward the theory that the claimants need to exhaust their administrative remedies with the Fund before filing a claim in the District Court, he made no formal ruling on the matter.

While the Court has given great consideration to this tentative ruling, the Court rules that the claimants need not exhaust their administrative remedies first.

The Court will now turn to the opponents' arguments that they need not exhaust their administrative remedies before filing an action in this Court. The opponents first argue that the Fund is a private corporation whose function is that of a secondary insurer.[4] While private corporations are not considered administrative agencies of the government, the opponents have not supported their theory that the doctrine of exhaustion applies only to government agencies. The *McKart* case does not state this proposition anywhere. The opponents have made a valid point that the case law referring to exhaustion of administrative remedies which they have cited concerns governmental agencies; however, this is not enough evidence to infer that the doctrine only applies to governmental agencies.

Next, the opponents argue that if Congress had intended the claimants to first exhaust their administrative remedies with the Fund, it would have explicitly provided for it. The opponents make a strong argument by showing that Congress had explicitly provided for administrative review before judicial review in the Federal Torts Claims Act, the Toxic Substance Control Act, and the Contracts Dispute Act. The Fund, on the other hand, cites no other authority illustrating an instance in which Congress did not explicitly outline a requirement for exhaustion in a statute which a court, nonetheless, held that exhaustion was required.

■■■ Since no explicit requirement for exhaustion exists, the Court will use the balancing test stated previously in the *Mor-*

---

ing to the Fund, only commence an action in the District Court after the Fund has first ruled on the claim. If the Fund takes more than two years to determine the amount of damages it must pay, then the claimants would be barred from commencing "any action" in the District Court pursuant to § 29.9(g) appealing the

Fund's determination. Thus, this subsection seems to allow for two avenues which a claimant may pursue.

4. The opponents cite § 1653(c)(4) which states that the Fund is established as a non-profit corporate entity.

*rison–Knudsen* case. The Court should balance the agency's interest in applying its expertise, correcting its own errors, making a proper record, and maintaining an efficient and independent administrative system. *Morrison–Knudsen*, 811 F.2d 1209, 1223. The Court should consider the following factors in balancing: (1) whether to resort to the administrative process would be futile; (2) whether an administrative process is well understood and well developed; (3) whether a prompt decision on all the contested issues in this case seems likely; (4) whether exhaustion would be fair to the parties and other parties whose interests might be affected; (5) whether the interests of judicial economy would be served; and (6) whether the agency demonstrates that not requiring exhaustion would unduly interfere with its functioning. *Id.*

The opponents argue that the Fund does not have a well developed administrative process. First, the Fund has seemingly not delineated any specific procedures by which the claimants would receive their damages. The claimants merely are to submit their claims stating, as specifically as possible, the damages incurred. However, the Fund allows for neither a formal hearing nor any published report of how the Fund came to its conclusion. Moreover, the Fund has hired claims adjusters—as provided in § 29.9(d)(2)—to review the processing and payment of claims according to the claim procedures established by the board of the Fund. The claim procedures establish categories of claims and a methodology for settling those claims which the adjusters are to follow. The board apparently does not look at specific claims but rather relies on the adjusters and experts retained by the Fund to implement the methodology set forth in the claim procedures.

These factors show that there is no well-developed administrative process of the Fund. Furthermore, since the Fund is hiring a claims adjuster to appraise the claims, the Fund's expertise is arguably not being used. Also, the Fund does not seem

to have an interest in making a proper record since no formal hearing occurs.

The opponents also argue that the Fund has no authority to make any binding determinations of fact. Thus, judicial economy is not served where contested issues exist. The opponents claim that the claim procedures will not advance litigation one day closer to resolution since the claimants would still have to file suit in this Court to determine any contested issues.

The Court considers these arguments to be quite strong, especially the argument that the Fund does not hear individual claims. That the Fund does not respond to these assertions in its reply brief lends more weight to balancing in favor of the opponents.

The rest of the arguments balance evenly. Some of the opponents assert that the Fund has yet to review or pay a single TAPAA claim although the accident took place over one year ago. Thus, they assert that exhaustion will not lend itself to prompt decisions.

The Fund, however, disputes this claim. The Fund states that ATTRANSCO, the owner of the American Trader, is processing and paying claims up to the $14 million limit. The Fund, in the meantime, has made the required inquiries to determine if it will assume responsibility for the claims in excess of $14 million. Furthermore, the Fund has entered into an agreement in which British Petroleum and ATTRANSCO agreed to assume responsibility for processing and paying claims in lieu of the Fund, subject to their right to seek reimbursement from the Fund. The Fund contends that it has been monitoring and reviewing all of the claims decisions to insure that all claims allowable under TAPAA are properly and timely paid. The Fund asserts that it expressly informed claimants that any obligation not adequately discharged by British Petroleum would be assumed by the Fund.

The opponents have questioned the Fund's agreements with ATTRANSCO and

British Petroleum to assume responsibility for processing and paying the claims. Furthermore, the Fund has retained a claims adjuster to hear the claims not filed with British Petroleum or ATTRANSCO. The opponents feel that this shows that the Fund does not have a well-developed and understood procedure for processing claims.[5]

The opponents make other arguments claiming that the balance should be in their favor; however, listing them would add many more pages to this already lengthy Memorandum of Decision and Order. The Court has considered all of the arguments made by the parties in balancing the interests of the Fund versus those of the claimants.

The Court holds that the balance should be tipped in favor of the claimants. The arguments set out above show that the Fund does not seem to have a great interest in applying its expertise, making a proper record, and maintaining an independent administration because it is not hearing individual claims and because British Petroleum, ATTRANSCO, and the claims adjusting firm are processing all of the claims. Thus, the Court denies the Fund's motion to dismiss on the exhaustion issue.

### III

The Fund lastly contends that TAPAA repeals the Limitation Act. The Limitation Act permits owners and vessel owners to limit their liability to the value of the ship after the accident plus its freight. TA-PAA, however, allows for the recovery of up to, but not more than, $14 million from the Owners or Operators of the vessel. The issue is whether this $14 million ceiling, in conjunction with the total ceiling of $100 million, repeals the Limitation Act.

However, the Court will not consider this question at this time. The Ninth Circuit is currently considering the answer to this question. In *In re Glacier Bay*, 741 F.Supp. 800 (D.Alaska) the Court considered this very question and held that TAPAA did repeal the Limitation Act. This ruling was appealed, and the Ninth Circuit has heard the arguments but has yet to decide the matter.

The Court will continue to keep this matter under submission until the Ninth Circuit has ruled on the issue.

### IV

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that if on a motion to dismiss for failure to state a claim, matters outside the pleadings are presented to, and not excluded by the Court, the motion shall be treated as one for summary judgment. In this motion, the parties have submitted to the Court matters outside the pleadings which it has considered. Thus, the Court converts this motion to dismiss as one for summary judgment.

### V

Furthermore, the Court holds that all suits in this matter are hereby consolidated.

This Memorandum of Decision and Order shall be deemed the Findings of Fact and Conclusions of Law, and judgment by the Court.

---

**5.** In fact, the opponents are critical of the claims adjusting firm which, during deposition testimony, asserted that it was inundated with settlements from the *Exxon Valdez* case.